JOURNAL ENTRY AND OPINION
{¶ 1} This is an appeal from a murder conviction. On June 8, 2002, Felix Cole (the "victim") suffered a gunshot wound and later died after a drug deal failed. In connection with his murder conviction, appellant, Anthony Vales ("appellant"), asserts four assignments of error.
 I {¶ 2} For his first assignment of error, appellant contends that the jury's verdict finding him guilty of murder was against the manifest weight of the evidence. In support of this contention, appellant argues that three of the state's witnesses lacked credibility because they are admitted drug users, three of the state's witnesses could not agree on whether there were four or five people in the apartment when the victim was shot, and one of the state's eyewitnesses to the murder suffers from glaucoma.
 {¶ 3} The relevant facts, as presented to the jury, are as follows. Immediately preceding his death, the victim, with his friend Freddy Cook ("Mr. Cook"), arrived at apartment 2-B of the Community Circle One Apartments in Hough, leased by Jackie Russell ("Ms. Russell"). According to Mr. Cook, the purpose of the visit was to "chill," but later turned into a desire to purchase crack cocaine. In addition to Mr. Cook and the victim, Darlene Moore ("Ms. Moore") arrived at Ms. Russell's apartment to smoke her crack cocaine, although Mr. Cook did not recall Ms. Moore being present in the apartment that night.
 {¶ 4} In search of crack cocaine, Ms. Russell went downstairs to the apartment complex's lobby and rang the buzzer to apartment 8-D, which was leased by appellant and his girlfriend, Tammy McCloud ("Ms. McCloud"). According to Ms. Russell, she thought appellant was the person from whom Mr. Cook could purchase crack cocaine because the day before, on June 7, 2002, she purchased crack cocaine from him. Appellant informed Ms. Russell over the intercom that he was busy. Approximately 15 minutes later, appellant arrived at Ms. Russell's apartment. According to Ms. Russell and Mr. Cook, appellant appeared "agitated" and "spacey," respectively. Ms. Moore testified that appellant seemed calm when he first arrived at Ms. Russell's apartment, but got "salty" shortly thereafter. Mr. Cook testified that when he told appellant that he purchased his crack cocaine from someone else, appellant began yelling at everyone and telling them to "shut up." The victim asked appellant if he was talking to him, to which appellant answered yes, and a heated, but brief, argument ensued between the victim and appellant. At this point, Ms. Moore testified that she went into the bathroom to smoke her crack cocaine.
 {¶ 5} Ms. Russell testified that at the time of the argument she was moving toward either the bedroom or the bathroom, telling appellant to calm down, and came back into the room where the three men were, saw appellant shoot the victim (who was sitting down) at very close range, and saw smoke coming from the handgun in appellant's hand Mr. Cook testified that he heard two gunshots fired and saw appellant holding a gun. While in the bathroom, Ms. Moore testified that she heard three or four gunshots fired, but did not see the actual shooting. Because she was frightened, Ms. Moore testified that she remained in the bathroom for almost ten minutes until it was silent in the apartment.
 {¶ 6} According to Ms. Russell, she began to scream, but was interrupted by appellant asking her for a shirt, which she gave him. Appellant took the shirt and put it on the victim. Appellant then dragged the victim out of Ms. Russell's apartment. Ms. Russell testified that she used her mop to soak up the blood from the victim's gunshot wound from the carpet in her apartment. In the meantime, Mr. Cook panicked, ran out of the apartment and apartment complex, without alerting the apartment complex's security guard or any authorities of the shooting.
 {¶ 7} Ms. Moore finally exited the bathroom, saw Ms. Russell mopping up the victim's blood, and "made a beeline to the door." In the hall, Ms. Moore testified that she saw the victim lying by the elevator, gasping for air, and appellant coming from the staircase and speaking on his cell phone, and moving in Ms. Moore's direction. Ms. Moore testified that she got onto the elevator, that she and appellant made eye contact, that appellant shook his head, and that she rode the elevator down to the lobby and ran out of the apartment complex without alerting anyone about the shooting.
 {¶ 8} The security guard at the apartment complex observed the appellant and the victim in the elevator as the elevator doors opened into the lobby. The appellant was holding onto the victim, who was clearly bleeding and gasping for air. The security guard assessed the situation, put his hand over the gash in the victim's left side, and attempted to keep the victim conscious. Appellant informed the security guard that he found the victim in the parking lot and carried the victim upstairs to an apartment and then brought him to the lobby. Appellant also informed the security guard that the victim was shot by someone in the parking lot. Thereafter, the security guard called 9-1-1 and the Cleveland police and paramedics arrived.
 {¶ 9} Based on what appellant said happened, the Cleveland police and the security guard searched the parking lot, looking for the shooter, any eyewitnesses, and any evidence of shell casings and blood. The investigation turned up no evidence. According to the Cleveland police and the security guard, there was no evidence of any blood in the parking lot where appellant claimed he found the victim, nor were there any shell casings from a gun. There was also no evidence of drag marks from where appellant claimed he dragged the victim.
 {¶ 10} While in the parking lot investigating, a Cleveland police officer noticed Ms. Russell on her balcony and went up to her apartment to speak with her. According to the Cleveland police, Ms. Russell told them that appellant shot the victim, dragged him out of her apartment, and shortly returned to tell Ms. Russell to tell the police, if asked, that the victim was shot in the parking lot and that appellant was trying to help him. While in Ms. Russell's apartment, the police observed numerous blood stains, the bloody mop, a bullet hole in the wall of the apartment, and a bullet slug on the floor. Based on Ms. Russell's information and physical evidence in her apartment, in addition to finding no evidence in the parking lot to suggest that the victim was shot there, appellant moved from a witness to a suspect in the shooting. Appellant was arrested.
 {¶ 11} The next day, Ms. Moore returned to the shelter where she resided and told a security guard there about the shooting. The security guard followed up on her account, informed Ms. Moore that the victim was dead, and informed the police. Ms. Moore later gave a statement to the police.
 {¶ 12} More than two days after the shooting, Mr. Cook was spotted and questioned by the police regarding the shooting. Mr. Cook told police that he heard two gunshots and saw appellant holding a gun in his hand Mr. Cook later gave a statement to the police.
 {¶ 13} The state also presented physical evidence through a forensic pathologist and deputy coroner, and a forensic scientist in the DNA department of the Cuyahoga County coroner's office. According to the coroner, the victim's gunshot wound to the chest and abdomen was consistent with the muzzle of the gun on a straight path and the path of the wound was consistent with someone sitting down, as testified by Ms. Russell. Also, as testified by the forensic scientist, the Griess test that was performed for nitrites indicated that the distance from the muzzle of the gun to the target (i.e., the victim) was between one and two feet, which is close range. Likewise, the blood on appellant's shirt and shoes matched the blood of the victim.
 {¶ 14} The proper test to be used when addressing the issue of manifest weight of the evidence is set forth as follows:
 {¶ 15} "Here, the test [for manifest weight] is much broader. The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the [fact finder] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. * * *" State v. Moore, Cuyahoga App. No. 81876, 2003-Ohio-3526, ¶ 8, quoting State v. Martin (1983), 20 Ohio App.3d 172, 175, 20 OBR. 215,485 N.E.2d 717; State v. Thompkins, 78 Ohio St.3d 380, 387,1997-Ohio-52, 678 N.E.2d 541, citing Tibbs v. Florida (1982), 457 U.S. 31,102 S.Ct. 2211, 72 L.Ed.2d 652.
 {¶ 16} The weight of the evidence and credibility of the witnesses are primarily for the trier of fact. Moore, at ¶ 8, citing State v.DeHass (1967), 10 Ohio St.2d 230, 227 N.E.2d 212. The power to reverse a judgment of conviction as against the manifest weight must be exercised with caution and in only the rare case in which the evidence weighs heavily against the conviction. Moore, at ¶ 8, citing Martin.
 {¶ 17} In determining whether a judgment of conviction is against the manifest weight of the evidence, this court in State v. Wilson (June 9, 1994), Cuyahoga App. Nos. 64442 and 64443, adopted the guidelines set forth in State v. Mattison (1985), 23 Ohio App.3d 10, 490 N.E.2d 926. These factors, which are not exhaustive, include:
 {¶ 18} "1) Knowledge that even a reviewing court is not required to accept the incredible as true;
 {¶ 19} "2) Whether evidence is uncontradicted;
 {¶ 20} "3) Whether a witness was impeached;
 {¶ 21} "4) Attention to what was not proved;
 {¶ 22} "5) The certainty of the evidence;
 {¶ 23} "6) The reliability of the evidence;
 {¶ 24} "7) The extent to which a witness may have a personal interest to advance or defend their testimony; and
 {¶ 25} "8) The extent to which the evidence is vague, uncertain, conflicting or fragmentary." Mattison, 23 Ohio App.3d 10 at syllabus.
 {¶ 26} Here, the testimony of Ms. Russell, Mr. Cook, and Ms. Moore, while not in agreement as to how many people were in the apartment at the time of the shooting, is consistent and place appellant in the apartment at the time of the shooting. All three witnesses testified that appellant was upset, either at the time he entered the apartment or shortly after the drug deal was soured. All three witnesses testified that they heard at least two gunshots fired, two of those witnesses saw the appellant holding a handgun, and at least one of the witnesses saw appellant shoot the victim at close range. All three witnesses later told the police what occurred and all three accounts are consistent, with the exception of a few minor discrepancies, such as the exact number of people in the apartment at the time of the shooting, the exact time of night each person arrived at the apartment, and the extent to which each person knew each other.
 {¶ 27} Even if the three witnesses' testimony is not credible solely because they are admitted drug users, as argued by appellant, the physical evidence produced by the state corroborates their testimony that the victim was shot at close range in the apartment where the victim's blood was smeared and the bullet slug was found. Moreover, if we were to discredit the witnesses' testimony because of their admitted drug use, appellant's own account of what occurred is even more fantastic and unbelievable. As thoroughly investigated by the police and the security guard, there was not even a scintilla of evidence to support appellant's "Good Samaritan" story that the victim was in the parking lot, wounded from a gunshot, bleeding, and then dragged by appellant, in an attempt to save his life, into the apartment complex. While the jury determines the credibility of the witnesses, the physical evidence (or lack thereof in the parking lot) does not lie. Based upon the review required of this court, and considering the entire record, the jury did not "clearly lose its way" and "create such a manifest miscarriage of justice" that appellant's conviction must be reversed. Thus, appellant's first assignment of error is without merit.
 II {¶ 28} For his second assignment of error, appellant contends that the trial court erred in allowing "other acts" evidence to be admitted. In support of his contention, appellant argues that the state sought to improperly establish that appellant acted in conformity with drug deals while shooting the victim by introducing witnesses who testified that they previously purchased drugs from appellant.
 {¶ 29} Evid.R. 404(B) provides as follows:
 {¶ 30} "(B) Other crimes, wrongs or acts. Evidence of the other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."
 {¶ 31} Here, unlike appellant's argument, the testimonies of Ms. Russell, Mr. Cook, and Ms. Moore go to the issue of proof of motive; i.e, giving appellant a motive to shoot the victim after a drug deal failed. Ms. Russell testified that appellant was in her apartment for the sole reason to sell crack cocaine to Mr. Cook. When Mr. Cook informed appellant he no longer wanted the drugs, appellant became angry. In addition to proof of motive, the testimony that appellant was a drug dealer also go to the issue of identity; i.e., showing appellant was in the apartment where people were using and/or preparing to use drugs and not outside in the parking lot assisting the wounded victim, as appellant claimed. Because appellant's "other acts" of drug dealing were offered to show proof of motive and identity, the trial court did not err in admitting this evidence. Appellant's second assignment of error is therefore without merit.
 III {¶ 32} For his third assignment of error, appellant contends that the trial court erred by allowing the jury to consider unfairly prejudicial irrelevant evidence by allowing the state to improperly vouch for the credibility of a witness. To support his contention, appellant argues that one of the police officers who questioned Ms. Moore vouched for Ms. Moore's credibility when he stated that her testimony was "consistent" with the statement she gave him and that the testimony of one of the police officers was improperly admitted because he concluded that the shooting occurred in the apartment. In addition, appellant argues that the photographs showing blood and a blood trail were improperly admitted because the state did not produce an expert to testify that the substance in the photographs was, in fact, blood.
 {¶ 33} First, appellant's argument that the police officer improperly vouched for the credibility of Ms. Moore is without merit. Unlike the instances where police officers usurp the role of the jury by testifying that the witness is "truthful," the police officer here simply testified that Ms. Moore's testimony was consistent with her statement to him. Cf., State v. Young, Cuyahoga App. No. 79243, 2002-Ohio-2744 (holding that it was plain error when a detective testified that a witness was "telling the truth.") This court held in In re: Shubutidze
(Mar. 8, 2001), Cuyahoga App. No. 77879, where the officer testified that she believed the victims and that she believed they were truthful, that the officer was not vouching for the victims' credibility, but rather she was explaining the investigative procedure she had followed. Likewise, the officer here, in explaining his investigative procedure he followed after learning what occurred from Ms. Moore, was not vouching for her credibility. The testimony, therefore, was admitted for proper purposes.
 {¶ 34} Second, appellant's argument that the trial court erred in allowing the police officer to testify that he concluded that the murder occurred in Ms. Russell's apartment (as opposed to the parking lot, as claimed by appellant) is also without merit. Here, the police officer was explaining the investigative procedure he followed, which included a thorough investigation of the parking lot, which produced nothing, and then Ms. Russell's apartment, where he discovered blood, a bullet hole in the wall, and a bullet slug on the floor. Because the officer's testimony was simply the explanation and culmination of his investigation, the trial court did not err in allowing the jury to hear it.
 {¶ 35} Finally, appellant's argument that the photographs were not properly authenticated as depicting "blood" is also without merit. Evid.R. 901(A) provides that the authentication or identification requirement to admissibility is "satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Here, the photographs admitted into evidence were those taken by the scientific investigation unit of the police department immediately following the actual shooting. The photographs were taken of the crime scene, including the various areas where blood was found. Although there was no testimony that the blood in the photographs was the victim's blood, when viewed along with the testimony of the police officers and the security guard, we cannot say that appellant was prejudiced by these crime scene photographs. Thus, the trial court did not err in admitting these photographs into evidence.
 IV {¶ 36} For his fourth assignment of error, appellant contends that he was denied the effective assistance of counsel. In particular, appellant argues that his counsel failed to object to "other acts" evidence, failed to request a limiting instruction on the "other acts" evidence, failed to object to the police officer's "vouching" for the credibility of Ms. Moore's testimony, and failed to object to the police officer's conclusion that the shooting occurred in the apartment. Appellant's contention is without merit.
 {¶ 37} First, as discussed in our analysis of appellant's second assignment of error, the "other acts" evidence was admissible because it went to proof of motive and identity. Any failure to object to this testimony or request a limiting instruction did not prejudice appellant.
 {¶ 38} Second, as discussed in our analysis of appellant's third assignment of error, the police officer's testimony that Ms. Moore made a statement to him that was consistent with her testimony and the police officer's conclusion that the shooting occurred in the apartment (and not in the parking lot) were explanations of the investigative procedures followed by the officers. Any failure to object to this testimony did not prejudice appellant, as it was admissible.
 {¶ 39} Moreover, to prove "ineffective assistance of counsel," appellant must show that counsel's performance was deficient and that the deficient performance prejudiced the defense so as to deprive him of a fair trial. Strickland v. Washington (1984), 466 U.S. 668, 687,104 S.Ct. 2052, 80 L.Ed.2d 674. To warrant reversal, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." State v. Bradley (1989),42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus, citing Strickland, 466 U.S. at 694.
 {¶ 40} Even if we were to agree with appellant that his counsel's performance was deficient, it is wholly unlikely — given the evidence in this case — that the result would have been different. Because it is not reasonably probable that the jury would have found differently had appellant's counsel objected and/or requested a limiting instruction at trial, appellant's assertion that he was denied the effective assistance of counsel is without merit.
 {¶ 41} The judgment is affirmed.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Kenneth A. Rocco, A.J., and Colleen Conway Cooney, J., concur.